[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-12758
Non-Argument Calendar

_____

Agency No. A215-824-594

ROBERT JUVENER GARCIA-GUITY,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(August 6, 2021)

Before MARTIN, LAGOA, and BRASHER, Circuit Judges.

PER CURIAM:

Robert Juvener Garcia-Guity is a native and citizen of Honduras. He is seeking review of the Board of Immigration Appeals' ("BIA") final order affirming the Immigration Judge's ("IJ") denial of his application for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"). Garcia-Guity says the IJ's adverse credibility finding, which the BIA adopted, is not supported by substantial evidence, and the BIA and IJ failed to give reasoned consideration to evidence corroborating his asylum claims. He also argues the BIA failed to give reasoned consideration to his claims for withholding of removal and CAT relief.

After careful consideration, we conclude the adverse credibility finding is supported by substantial evidence. However, we agree with Garcia-Guity that the BIA failed to give reasoned consideration to all of his corroborating evidence and to his withholding of removal and CAT claims. Therefore, we grant his petition, vacate the decision of the BIA, and remand for further proceedings.

## I.    BACKGROUND

Garcia-Guity is an asylum applicant facing removal. He alleges that he came to the United States to escape persecution in Honduras on account of his race (Black), ethnic group (Garifuna), and disability. He entered the United States in September 2018.

A. Credible Fear Interview

After Garcia-Guity arrived in the United States, an asylum officer conducted a credible fear interview ("CFI").  The administrative record does not contain the full transcript of Garcia-Guity's CFI, only notes.  The document containing these notes has the following disclaimer:

> THE FOLLOWING NOTES ARE NOT A VERBATIM TRANSCRIPT OF THIS INTERVIEW.  THESE NOTES ARE RECORDED TO ASSIST THE INDIVIDUAL OFFICER IN MAKING A CREDIBLE FEAR DETERMINATION AND THE SUPERVISORY ASYLUM OFFICER IN REVIEWING THE DETERMINATION.  THERE MAY BE AREAS OF THE INDIVIDUAL'S CLAIM THAT WERE NOT EXPLORED OR DOCUMENTED FOR PURPOSES OF THIS THRESHOLD SCREENING.

The CFI notes indicate that Garcia-Guity left Honduras because he was afraid of the 18 gang.  Garcia-Guity said the 18 gang was after him because he reported them for beating him in 2014.  According to the notes, Garcia-Guity said the gang beat his leg repeatedly with a pipe, shattering his bone and knocking him to the ground.  The gang left him lying in the street until some people found him and took him to the hospital.  Doctors performed surgery on Garcia-Guity's leg but were unable to put his shattered bone back together.  As a result, Garcia-Guity has multiple pieces of platinum in his leg, which continue to cause him pain today.  He spent about a month in the hospital recovering.  The gang also stole Garcia-Guity's wallet and cellphone and threatened to kill him if he reported them to the police.

3

The notes say that when Garcia-Guity was asked why the gang was harassing him, he responded: "They weren't harassing me, but they were just stealing from everybody in town."

The CFI notes also indicate that Garcia-Guity said his family reported the beating to the police, who came to the hospital to take his statement. However, Garcia-Guity said he thinks the police told the gang that he reported them because soon after he gave his statement, the gang sent him messages through his sister saying not to return home or they would kill him. After leaving the hospital, Garcia-Guity moved to San Pedro Sula, about four hours away from his hometown. He underwent physical rehabilitation for his leg for about a year until he was able to walk again, but with a limp.

Garcia-Guity was unable to get permanent work in San Pedro Sula as a result of discrimination due to his limp and his race. The discrimination and inability to work caused Garcia-Guity stress, which triggered his vitiligo, a disease that causes white patches to break out on his skin. The vitiligo caused patches on his face which led to more discrimination. For instance, he was told that he "didn't look right to work at restaurants" and that "even kids were afraid of [him]."

The CFI notes indicate that when Garcia-Guity was asked whether he had ever been threatened or harmed on account of his race, he said he was discriminated against for being Black but he "wasn't threatened or harmed, just

4

called names." He said he did not believe he could safely return to Honduras because gangs will find him anywhere.

B. Written Application and Hearing Before the IJ

Garcia-Guity filed a written application for asylum, which differed from his CFI. He said that in 2014 he was attacked by gang members in his town who called him a "damn negro" and a "damn Garifuna negro" as they beat him. They beat him with a pipe, tried to shoot him, and threatened to kill him. The beating stopped only because Garcia-Guity's neighbor drove his car towards them, and he believes they would have killed him otherwise. As a result of the beating, his leg was completely broken and required metal inserts. The police took his statement while he was in the hospital but did nothing further.

Garcia-Guity worked as a ship repairman who specialized in fiberglass but the beating left him permanently disabled and unable to continue his job. This stress aggravated his vitiligo and he developed large white patches on his face, hands, and feet. Because of his skin condition and his leg, he was unable to find employment.

Garcia-Guity's written application also described discrimination and harassment experienced by his family members as a result of being Black Garifuna. For instance, the police detained his brother three times while he was leaving work late at night and beat him twice. When his brother told the police he

5

would report them, they threatened to beat him further.

Garcia-Guity also testified at his final merits hearing. He testified that he is a member of the Garifuna race and ethnic group, that the Garifuna are descended from escaped victims of the transatlantic slave trade, and that they have maintained their own language and culture. He experienced racism from a young age. For example, the Garifuna tried not to speak their language "in order to avoid any form of abuse from white people" and they received "threats and fights" when they did speak their language. In his twenties he was hired at a shipyard and became a skilled maritime vessel fiberglass technician.

In 2012, Garcia-Guity moved within Honduras to La Cieba with his sister, her family, and his father. They were one of two Garifuna families in the town and they were the victim of racist abuse as soon as they arrived. The other Garifuna family fled the town because of death threats. In 2013, Garcia-Guity's sister, Lesma, was raped multiple times and beaten by neighbors. They called her racial slurs and left her lying on the ground with her hands and mouth tied up, her blouse ripped, and no underwear. Garcia-Guity found her. When he called the police, they said they had no patrolmen working that night and took no further action. Later, Lesma told Garcia-Guity that the neighbors had continued to rape her by breaking into the house while he was at work. They said that if she told Garcia-Guity, they would kill him.

Garcia-Guity also testified about the beating he suffered in 2014.  He said that gang members took his money, beat him severely, kicked him, and threw him to the floor.  One gang member put a gun to his head, called Garcia-Guity a racial slur, said "this is it for you . . . because you didn't want to leave," and pulled the trigger.  The gun did not discharge.  Garcia-Guity tried to run away but he was struck on his leg and fell to the floor.  The gang members continued to beat him until he could not move his leg at all.  They called him racial slurs throughout and told him he was going to die.  Garcia-Guity believes he was beaten by the same people who raped his sister.  The attack only stopped because a neighbor drove his car at the assailants and took Garcia-Guity to the hospital.  Doctors told Garcia-Guity that he needed eight pints of blood and metal screws in his leg.  While he was in the hospital, the people who attacked him contacted his sister and said that he was lucky the gun did not go off and that not to return home because "next time they were not going to miss."

Garcia-Guity moved to San Pedro Sula and did a year of physical therapy so that he could walk.  Nevertheless, he is still unable to walk normally and experiences pain on a daily basis.  After the attacks he was unable to get work and fell into a depression.  The stress he was under caused white spots to appear on his face, hands, and legs.  He still experienced racism in San Pedro Sula and in 2017 his apartment was burglarized and ransacked, he believes by the same people who

attacked him in La Cieba.  His landlady told him that people had been looking for

him, who said they knew where he lived, and that they were going to kill him.

After the break-in, Garcia-Guity left his apartment and struggled to obtain stable

housing.  He had a difficult time getting and keeping a job because of his disability

and his race.  Sometimes he slept on a park bench.  He received a text from his

attackers saying they knew where he was working and what bench he was sleeping

on.  Garcia-Guity fled Honduras in June 2018 because he did not feel safe

anywhere and felt like if he stayed he would be killed.

Garcia-Guity also testified about the circumstances of his credible fear

interview.  He said the asylum officer did not allow him to fully explain his

answers and wanted him to answer only yes or no.  The officer would stop him

whenever he tried to explain.  Garcia-Guity testified that he tried multiple times to

explain what happened with his neighbors and his sister's rape, but the officer did

not allow him to.

In addition to his testimony, Garcia-Guity presented several pieces of

evidence including letters from his family and others, medical records, news

articles, and country condition reports.  For instance, his brother and sister

submitted letters corroborating that his attack was racially motivated.  Garcia-

Guity also included reports from a Garifuna organization and a U.S. government

contractor explaining that the type of persecution he described is commonly

8

experienced by the Garifuna people in Honduras.

C. The IJ's Decision

The IJ denied Garcia-Guity's applications for relief and ordered him removed to Honduras. The IJ found Garcia-Guity not credible based on inconsistencies between his testimony and the CFI notes, which the IJ found reliable. The IJ stated that the "corroborating evidence contradict[ed] or undermine[d] his claim of persecution." The IJ found the letters Garcia-Guity submitted from family members were of limited probative value because they were prepared by interested witnesses. The IJ otherwise stated summarily that Garcia-Guity's evidence failed to reasonably corroborate his claims. The IJ found Garcia-Guity ineligible for withholding of removal and CAT relief.

D. The BIA's Decision

Garcia-Guity appealed to the BIA. The BIA affirmed the IJ's decision with respect to the credibility finding and noted that the inconsistencies between Garcia-Guity's testimony and the CFI notes supported that finding. The BIA agreed with the IJ that the CFI record was reliable. The BIA also upheld the IJ's determination that Garcia-Guity failed to provide sufficient corroborating evidence. It agreed with the IJ that the statements of family members were due less weight.

The BIA concluded that the IJ's findings on credibility and corroborating evidence supported its denial of the asylum and withholding of removal claims.

The BIA also found that Garcia-Guity did not meaningfully challenge the IJ's determination that he had not met his burden for CAT relief and, as a result, had not established eligibility for CAT relief.

This is Garcia-Guity's petition for review.

## II.    STANDARDS OF REVIEW

When the BIA "explicitly agree[s] with . . . findings of the immigration judge, we review the decisions of both the Board and the immigration judge as to those issues." Ayala v. U.S. Att'y Gen., 605 F.3d 941, 948 (11th Cir. 2010). Otherwise we review the BIA decision only. See id. We review de novo legal determinations and factual findings for substantial evidence. Id. But to enable meaningful review of its decision, the BIA must give "reasoned consideration" to the petitioner's claims and evidence. Ali v. U.S. Att'y Gen, 931 F.3d 1327, 1333 (11th Cir. 2019). Under a "reasoned-consideration examination," we look to whether the BIA has "considered the issues raised and announc[ed] its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." Jeune v. U.S. Att'y Gen., 810 F.3d 792, 803 (11th Cir. 2016) (quotation marks omitted). The BIA is not required to address "each piece of evidence." Id. (quotation marks omitted). But the BIA fails to give reasoned consideration to a claim when it "misstates the contents of the record" and when it "fails to adequately explain its rejection of logical conclusions." Id.

10

When the BIA does not give a petitioner's claims reasoned consideration, we vacate the agency's decision and remand for further proceedings. Id. An IJ's determination of an applicant's credibility is a factual finding that we review under the substantial evidence standard. Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005).

## III.    DISCUSSION

### A. Adverse Credibility Determination

Garcia-Guity says the BIA erred in affirming the IJ's adverse credibility finding because it was not supported by substantial evidence. On this record, we are unable to agree. "Once an adverse credibility finding is made, the burden is on the applicant [noncitizen] to show that the IJ's credibility decision was not supported by 'specific, cogent reasons' or was not based on substantial evidence." Forgue, 401 F.3d at 1287.

Here, the IJ and BIA gave specific, cogent reasons for finding Garcia-Guity not credible. There are several inconsistencies between Garcia-Guity's CFI and his testimony at the removal hearing. For instance, in his CFI, Garcia-Guity said that when the 18 gang beat him in 2014 "[t]hey weren't harassing [him], but they were just stealing from everybody in town." And the notes reflect that he specifically denied having been threatened or harmed based on his race. Yet at the removal hearing, Garcia-Guity testified that this beating was racially motivated.

11

As another example, the CFI notes recount that Garcia-Guity said the gang that attacked him never threatened or harmed him again. At the removal hearing, in contrast, he testified that the gang continued to contact him and look for him after he moved to San Pedro Sula, including breaking into his apartment with the intent to kill him.

In evaluating adverse credibility findings, this Court distinguishes between testimony that "merely elaborates upon" prior statements and testimony that "actually contradicts" and "cannot be squared with" prior statements. Shkambi v. U.S. Att'y Gen., 584 F.3d 1041, 1050 (11th Cir. 2009) (per curiam) (quotation marks omitted). The inconsistencies here fall into the second category. Rather than merely elaborating on his statements during the CFI, Garcia-Guity's testimony during his removal hearing directly contradicts his prior statements. Garcia-Guity's testimony at his hearing describes persecution that is racially motivated and sustained, while the notes from his CFI reflect that Garcia-Guity's 2014 attack was an isolated incident not related to his race but instead part of crime that many people in his town were experiencing.

Although Garcia-Guity testified that his CFI was rushed and he was not permitted to fully explain his answers, this does not compel a conclusion that he was credible. See Forgue, 401 F.3d at 1287 ("A credibility determination, like any fact finding, may not be overturned unless the record compels it." (quotation marks

12

omitted)).  Again here, and as the IJ and BIA recognized, Garcia-Guity's CFI answers (though often a single word) directly contradicted his testimony at the removal hearing.  For example, at the removal hearing Garcia-Guity testified that the gang continued to threaten him after the 2014 attack.  But the notes from his CFI show that when asked whether the gang "threaten[ed] or harm[ed] [him] again" Garcia-Guity replied "[n]o."  Neither does the fact that the CFI notes are not a verbatim transcript compel a finding that Garcia-Guity is credible.  As explained, the CFI notes do not merely omit information revealed in Garcia-Guity's hearing testimony, but in multiple instances the notes directly contradict his subsequent testimony.

## B. Corroborating Evidence

"[I]n the absence of corroborating evidence, an adverse credibility determination may be sufficient to support the denial" of asylum.  Mohammed v. U.S. Att'y Gen., 547 F.3d 1340, 1345 (11th Cir. 2008).  However, "an adverse credibility determination does not alleviate the IJ's duty to consider other evidence produced by an asylum applicant.  That is, the IJ must still consider all evidence introduced by the applicant."  Forgue, 401 F.3d at 1287.  Garcia-Guity says the BIA and IJ failed to give reasoned consideration to three pieces of evidence corroborating his testimony: (1) written statements by his brother, sister, and uncle; (2) a radiologist report and other medical records detailing the injuries to Garcia-

13

Guity's leg as a result of the 2014 beating; and (3) written statements by officers of the Garifuna Nation and a United States government contractor in Honduras. We are unable to agree with Garcia-Guity as to the statements from his family members and the radiology report. However, we conclude that neither the BIA nor the IJ gave reasoned consideration to the statements from the Garifuna Nation officers and the United States government contractor.

Garcia-Guity is right that neither the IJ nor the BIA analyzed the radiologist report. But the report only supports his claim that he was injured, not the circumstances surrounding the injury. The report finds that "[m]ultiple views of [Garcia-Guity's] left femur demonstrate comminuted fracture of the mid femoral shaft" and confirms the presence of an "[i]ntramedullary nail." In other words, the radiology report shows that Garcia-Guity had metal put in his leg. That supports Garcia-Guity's statement from his CFI that he had platinum inserted into his leg as a result of the 2014 beating. But the inconsistency between his CFI and his subsequent testimony relates to the reasons why the beating occurred—was it racially motivated or an isolated incident unconnected to his race? The radiology report provides no insight into how or why Garcia-Guity was injured. It thus does not corroborate his subsequent testimony.

As for the written statements from his family members, the BIA evaluated this evidence. The BIA concluded that the IJ "properly determined that the

14

statements from his family members were afforded limited probative value as they were prepared by interested witnesses" and cited to a case finding that letters from interested witnesses not subject to cross-examination are afforded little weight. We cannot say the BIA was "merely react[ing]" with respect to this evidence. Jeune, 810 F.3d at 803 (quotation marks omitted).

Nevertheless, the BIA and IJ decisions fall short of reasoned consideration because neither decision gives any consideration at all to the written statements from the officers of the Garifuna Nation and the U.S. government contractor.[1] Indeed, the decisions appear to contradict the statements of the officers and the contractor. For example, the statement from the officers of the Garifuna Nation says they "reviewed the case of Mr. Garcia Guity and can confirm that the abuses he endured because of racism are consistent with the experiences of many of our people in Honduras." And the officers give examples of attacks similar to what Garcia-Guity experienced, such as when one of the officer's nephews was "beaten so severely that he was hospitalized," which "happened because of racism against

---

[1] The government says we lack jurisdiction to consider this evidence because Garcia-Guity did not exhaust these arguments before the BIA. However, our precedent says we cannot consider claims not raised before the BIA. See Amaya-Artunduaga v. U.S. Att'y Gen., 463 F.3d 1247, 1250 (11th Cir. 2006) (per curiam) (holding that the Court lacked jurisdiction to review adverse credibility determination where non-citizen did not challenge the IJ's adverse credibility determination at all before the BIA). Before the BIA in his case here, Garcia-Guity challenged the adverse credibility determination as well as the IJ's finding that he presented insufficient corroborating evidence. So the BIA was required to consider "all evidence" related to that claim. Forgue, 401 F.3d at 1287. We have jurisdiction to review whether it met that requirement.

15

Garifuna people." The statement from the U.S. contractor Jim Bach provides "context of the Garifuna people in Honduras and the fear claim that Robert Juvener Garcia Guity has experienced." Bach worked in Honduras for two years and "spent quite a bit of time with Garifuna community members" during which he "learn[ed] about . . . human rights abuses." Bach's statement describes how "[o]n a daily basis The Garifuna are subject to various forms of prejudice and racism" including "violence against individuals, especially those living outside of majority Garifuna communities."

These written statements are critical because, as described above, the only other evidence describing the persecution of the Garifuna in Honduras—the statements from Garcia-Guity's family members—were found not probative. Unlike Garcia-Guity's family members, the officers of the Garifuna Nation and Bach are not interested witnesses. And their statements lend support to Garcia-Guity's testimony that his 2014 beating was on account of his race, which is the key discrepancy between his CFI and subsequent testimony. While the BIA is not required to consider every piece of evidence, the statement that Garcia-Guity proffered <u>no</u> evidence that corroborates his claim misstates the record. <u>Jeune</u>, 810 F.3d at 803. And the BIA's failure to explain why it discounted these pieces of evidence constitutes a failure to "adequately explain its rejection of logical conclusions," namely the conclusion that Garcia-Guity was the victim of, and

16

feared being the future victim of, common forms of persecution experienced by the Garifuna people.  Id.  Thus, the BIA and IJ decisions did not fully consider whether his testimony was corroborated.  In light of this deficiency, we are unable to meaningfully review the BIA's decision regarding Garcia-Guity's claim for asylum.  Because the BIA rested its decision on the credibility determination and lack of corroboration, it did not evaluate Garcia-Guity's claim regarding future persecution.  Therefore, our holding that the BIA failed to give reasoned consideration to Garcia-Guity's corroborating evidence requires remand as to both Garcia Guity's past and future persecution claims.

We thus grant Garcia-Guity's petition, vacate the decision of the BIA, and remand for further proceedings.

C.  Withholding of Removal and Relief Under the CAT

We also vacate the BIA's decision and remand with respect to Garcia-Guity's claims that he is entitled to withholding of removal and relief under the CAT.  Remand is necessary on the withholding of removal question because the BIA's decision does not address withholding of removal at all.  See Ali, 931 F.3d at 1333 (explaining that remand for lack of reasoned consideration is proper where "the agency decision is so fundamentally incomplete" (quotation marks omitted)).  And the BIA's conclusion that Garcia-Guity did not meaningfully challenge the IJ's denial of his CAT claim is not supported by his briefing before the Board,

17

which expressly argued that the IJ erred on this point and that his evidence regarding his fear of persecution demonstrates his entitlement to relief under the CAT as well.  Thus, because we hold that the BIA failed to give reasoned consideration to Garcia-Guity's corroborating evidence regarding asylum, we remand on the CAT issue as well.

## IV.    CONCLUSION

For these reasons, we **GRANT** Garcia-Guity's petition for review, **VACATE** the decision of the BIA, and **REMAND** for further proceedings consistent with this opinion.